**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| SAM BERTOLINO, derivatively on behalf of HUT 8 CORP., | |
| Plaintiff, | Case No. |
| v. | JURY TRIAL DEMANDED |
| ASHER GENOOT, MICHAEL HO, JAIME LEVERTON, SHENIF VISRAM, JOSEPH FLINN, ALEXIA HEFTI, STANLEY O'NEAL, CARL J. RICKERTSEN, MAYO A. SHATTUCK, III, BILL TAI, and AMY WILKINSON, | |
| Defendants, | |
| and | |
| HUT 8 CORP., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Sam Bertolino ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Hut 8 Corp. ("Hut 8" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Asher Genoot ("Genoot"), Michael Ho ("Ho"), Jaime Leverton ("Leverton"), Shenif Visram ("Visram"), Joseph Flinn ("Flinn"), Alexia Hefti ("Hefti"), Stanley O'Neal ("O'Neal"), Carl J. Rickertsen ("Rickertsen"), Mayo A. Shattuck, III ("Shattuck"), Bill Tai ("Tai"), and Amy Wilkinson ("Wilkinson") (collectively, the "Individual Defendants," and together with Hut 8, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Hut 8, unjust enrichment, waste of corporate

1

assets, gross mismanagement, and abuse of control, and against Defendants Genoot, Ho, Leverton, and Visram for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of corporate documents produced by Defendants to Plaintiff's counsel, [1] the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hut 8, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Hut 8's current and/or former directors and officers from February 13, 2023 through January 18, 2024, both dates inclusive (the "Relevant Period").

2. Hut 8 is a technology company which "integrates power, digital infrastructure, and compute at scale to fuel next-generation, energy-intensive use cases such as Bitcoin mining and high-performance computing." Hut 8 is split into three operating segments, which the Company calls "Layers," called Power, Digital Infrastructure, and Compute.

---

[1] References to "HUT8_0000" are to the Books and Records.

3.　　Hut 8's Power segment is the Company's "foundation," which acquires, develops, and manages critical energy assets such as interconnects, powered land, and other electrical infrastructure. The Digital Infrastructure segment designs, builds, monetizes, and operates purpose-built facilities for Hut 8's operations. The Compute segment acquires, monetizes, and operates specialized hardware for the Company's operations.

4.　　Prior to the Relevant Period, the Company operated as Hut 8 Mining Corp. ("Pre-Merger Hut 8"), which was a Canadian Bitcoin mining company that had various mining sites throughout Canada, including two digital asset mining sites in Alberta, Canada, five high performance computing data centers in British Columbia and Ontario, Canada, and one authorized repair center in Alberta, Canada.

5.　　U.S. Data Mining Group. d/b/a US Bitcoin Corp. ("USBTC") was a privately held industrial-scale operator of Bitcoin mining sites based in the United States. In December 2022, USBTC acquired a 50% interest in a Bitcoin mining site in King Mountain, Texas (the "King Mountain JV"). USBTC acquired its interest in the King Mountain JV through an auction process in connection with the Chapter 11 bankruptcy filing of Compute North Member LLC ("Compute North"). The Company acquired Compute North's 50% interest in TZRC LLC ("TZRC"), the other 50% of which was held by NextEra Energy, Inc. ("NextEra"), and assumed a senior secured promissory note related to the King Mountain JV. Marathon Digital Holdings, Inc. ("Marathon") was the biggest customer of the King Mountain JV facility.

6.　　████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████

7.      ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

8.      ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

9.      ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

10.     On February 7, 2023, Pre-Merger Hut 8 and USBTC issued a press release (the "Merger Announcement Press Release") announcing the merger of Pre-Merger Hut 8 and USBTC (the "Merger"). The Merger Announcement Press Release stated that both the USBTC board of directors (the "USBTC Board") and the Pre-Merger Hut 8 Board unanimously approved the merger pursuant to a business combination agreement.

11.     On February 13, 2023, Hut 8 filed an initial registration statement on Form S-4 with the SEC in connection with the merger (the "Initial Registration Statement"). The Initial Registration Statement was amended several times throughout 2023, and the SEC declared the registration statement effective on November 9, 2023. On November 30, 2023, the Merger between Pre-Merger Hut 8 and USBTC closed.

12.     Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements regarding energy and internet issues at the King Mountain JV facility. For example, the Initial Registration Statement provided the following risk disclosure to investors: "The operation of the grids USBTC relies on, including the . . . [Electrical Reliability Counsel of Texas (ERCOT)] grid[] . . . subjects USBTC to a variety of risks, including the breakdown and failure of equipment . . . [and] outages affecting information technology systems."

13.     The Initial Registration Statement also provided investors with the following risk disclosure regarding internet disruptions at the Company's facilities:

> **USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.**
>
> A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is

resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

14. The truth emerged on January 18, 2024, when J Capital Research published a report titled "The Coming HUT Pump and Dump: Management hiding stock ownership through undisclosed related party, a stock-promotor cabal, and a host of left-for-dead assets" (the "J Capital Report"). The J Capital Report revealed that internet and energy issues had already materialized at the King Mountain JV facility. Specifically, the J Capital Report stated the King Mountain JV "has historically failed to provide energy and high-spend internet" including at the time of the merger.

15. The J Capital Report also revealed that the King Mountain JV facility "uses a Starlink satellite network instead of a broadband connection to access the Internet," which is "**unheard of in the Bitcoin mining industry**" because Starlink "is an expensive and unreliable choice for mining at scale."

16. On this news, the price of the Company's stock fell $2.16 per share, or 23.3%, from a closing price of $9.28 per share on January 17, 2024 to close at $7.12 per share on January 18, 2024.

17. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Hut 8, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the King Mountain JV facility was already experiencing internet and energy issues; and (2) as a result, the King Mountain JV was not operating efficiently. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while two of the Individual Defendants engaged in improper insider sales, netting total proceeds of *approximately $2 million.*

19.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

20.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former CEO, its former Chief Financial Officer ("CFO"), and its Chief Strategy Officer ("CSO") to a federal securities fraud class action pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

21.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

22.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Genoot's, Ho's, Leverton's, and Visram's liability in the Securities Class Action, their being beholden to each other, their longstanding business and

7

personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of this District or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

28.    Plaintiff is a current shareholder of Hut 8. Plaintiff has continuously held Hut 8 common stock since November 12, 2021.

### Nominal Defendant Hut 8

29.    Hut 8 is a Delaware corporation with its principal executive offices at 1101 Brickell Avenue, Suite 1500, Miami, Florida 33131. Hut 8 shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "HUT."

### Defendant Genoot

30.    Defendant Genoot has served as the Company's CEO since February 2024. Prior to the Merger, he served as the Chief Operating Officer ("COO"), President, and director of USBTC from December 2020 until November 2023.

31.    The Schedule 14A the Company filed with the SEC on April 30, 2025 (the "2025 Proxy Statement") stated the following about Defendant Genoot:

> Mr. Genoot served as President, Chief Operating Officer, and a director of USBTC from its inception in December 2020 until the consummation of the Business Combination. He has been a serial entrepreneur who started his first business, the Ivy Crest Institute of International Education, at the age of 19 in Shanghai, China and sold it shortly after. Following that experience, Mr. Genoot served as the founder and Chief Executive Officer at Curio, a Shanghai-based education company that expanded across the country from April 2016 to May 2019. He served on the board of directors of Ionic Digital Inc. from January to June 2024. He also has experience as the Managing Director at Flagship Endeavors, a brand incubator, a position he held from January 2019 to December 2020. Mr. Genoot graduated from the University of Southern California with a Bachelor of Business Administration.

### Defendant Ho

32.     Defendant Ho has served as the Company's CSO since November 2023. He previously served as the CEO and Chairman of USBTC from December 2020 until November 2023.

33.     The 2025 Proxy Statement stated the following about Defendant Ho:

Mr. Ho previously served as Chief Executive Officer of USBTC and as Chairman of its board of directors from its inception in December 2020 until the consummation of the Business Combination. Mr. Ho has experience as a serial entrepreneur, having founded numerous businesses in the digital and traditional trade sectors. He served as the Chief Executive Officer of Vancouver Motorcars Ltd. (formerly Advant Automotive Inc.) from January 2012 to April 2015. Mr. Ho then served as the Chief Executive Officer of MKH International Ltd., from July 2015 to December 2018. During this six year period, Mr. Ho specialized in currencies, international trade, structured financings, and equity structuring. Mr. Ho also has extensive experience in the digital asset mining industry, having begun mining digital assets in 2014. In 2017, Mr. Ho began setting up businesses procuring, managing, and selling turnkey digital asset mining facilities.

**Defendant Leverton**

34.     Defendant Leverton served as the Company's CEO from November 2023 until February 2024. She previously served as the CEO of Pre-Merger Hut 8 from December 2020 until November 2023.

35.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Leverton made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 22, 2023 | 98,724 | $14.21 | $1,402,957 |
| January 12, 2024 | 35,761 | $10.10 | $361,261 |

Thus, in total, before the fraud was exposed, Defendant Leverton sold 134,485 shares of Company common stock on inside information, for which she received approximately $1.8 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

36.    The Initial Registration Statement stated the following about Defendant Leverton:

Ms. Leverton is currently Chief Executive Officer of Hut 8. Ms. Leverton is a highly accomplished technology executive and industry thought leader with a long history of driving high growth mandates. With more than 20 years of leadership in the Canadian technology industry, she joined Hut 8 from her role as the Chief Commercial Officer at eStruxture Data Centers. Her career also includes tenure as the General Manager of Canada and APAC with data center and cloud provider Cogeco Peer 1 (now Aptum) and leadership roles with National Bank, BlackBerry, Bell Canada and IBM Canada. She proudly sits on the boards of the Stratford Festival and Technation.

**Defendant Visram**

37.    Defendant Visram served as the Company's CFO from November 2023 until August 2024. He previously served as Pre-Merger Hut 8's CFO from December 2022 until November 2023.

38.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Visram made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 22, 2023 | 17,897 | $14.14 | $253,067 |

Thus, in total, before the fraud was exposed, Defendant Visram sold 17,897 shares of Company common stock on inside information, for which he received approximately $253,067 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

39.     The Schedule 14A the Company filed with the SEC on April 26, 2024 (the "2024 Proxy Statement") stated the following about Defendant Visram:

Shenif Visram has served as our Chief Financial Officer since the consummation of the Business Combination. Mr. Visram had previously served as Chief Financial Officer of Legacy Hut since December 2022. With over 20 years of experience leading world-class finance organizations, Mr. Visram brings a breadth of corporate and operational finance experience to Hut 8. He began his finance career at IBM Canada, where he progressed to the CFO roles in the largest IBM Canada Business units. He then moved to Cogeco Peer 1 as Vice President, Finance from September 2015 to April 2019, where he jointly led the sale of the company to a private equity firm. Mr. Visram remained with the company post-sale and assumed the role of CFO from April 2019 to July 2021, where he led the privatization of the company and played a key role in rebranding to Aptum Technologies. Mr. Visram holds a Bachelor of Business Administration from the Schulich School of Business at York University and is a Charter Professional Accountant (CPA, CMA).

**Defendant Flinn**

40.     Defendant Flinn has served as a Company director since November 2023. He also served as the Chair of the Audit Committee. He previously served as a director of Pre-Merger Hut 8 from August 2018 until November 2023.

41.     The 2025 Proxy Statement stated the following about Defendant Flinn:

Mr. Flinn has served as the Chief Financial Officer of Seaboard Transportation Group, a major international bulk transportation group of companies, since March 2019. Prior thereto, Mr. Flinn served as President of Clarke Transportation Group, a major North American shipping and transportation company, from March 2017 to February 2019. Mr. Flinn also held senior leadership positions at Sysco Corporation from 2008 to 2015, where he played an integral role as both Chief Financial Officer of Sysco Canada, and President of Sysco Canada's Eastern Division. Mr. Flinn holds a Bachelor of Commerce from Saint Mary's University and is a chartered professional accountant. Mr. Flinn is a member of the Institute of Corporate Directors and holds an ICD.D designation.

**Defendant Hefti**

42.     Defendant Hefti served as a Company director from November 2023 until June 2024. She previously served as a director for Pre-Merger Hut 8 from May 2021 until November 2023.

43.     The Initial Registration Statement stated the following about Defendant Hefti:

Ms. Hefti has served as a director of Hut 8 since May 2021. She is Executive Chairman and Partner of the Abed Group, a venture studio and private equity fund for blockchain regulatory technology companies. She was previously the CEO of eGovern.com, assisting governments in designing blockchain-enabled government services aimed at increasing citizenry engagement and governance. Ms. Hefti worked at Deloitte Middle East and Deloitte Canada, where she co-founded the blockchain and digital asset tax advisory practice. Ms. Hefti sits on the Bermuda Global FinTech Advisory Board to assist the government in developing its fintech ecosystem. Ms. Hefti is a New York-qualified lawyer, and a graduate from McGill University (B.C.L/ LL.B) and the University of British Columbia (BA).

**Defendant O'Neal**

44.     Defendant O'Neal has served as a Company director since November 2023. He also serves as a member of the Audit Committee and Nominating and Governance Committee. He previously served as a director of USBTC from March 2021 until November 2023.

45.     The 2025 Proxy Statement stated the following about Defendant O'Neal:

Mr. O'Neal is the former Chairman and Chief Executive Officer of Merrill Lynch & Co., Inc. ("Merrill Lynch"). He became Merrill Lynch's chief executive in 2002 and was elected Chairman of Merrill Lynch in 2003, serving in both positions until October 2007. Mr. O'Neal worked for Merrill Lynch for 21 years. He was named President and Chief Operating Officer in 2001 and before that was President of the brokerage firm's U.S. Private Client group. He served as Executive Vice President and Chief Financial Officer of Merrill Lynch from 1998 until 2000 and also held the position of Executive Vice President and Co-Head of the Corporate and Institutional Client Group for one year starting in 1997. Before joining Merrill Lynch, Mr. O'Neal was employed at General Motors Corporation where he held a number of financial positions of increasing responsibility, including General Assistant Treasurer. He served on General Motor's board of directors from 2001-2006 and on Arconic's board of directors from 2008 (through Arconic's predecessor, Alcoa) to August 2023. He also served as director of American Beacon Advisors, Inc. from 2009 to September 2012. Mr. O'Neal currently serves on the boards of Clearway Energy, Inc. and Element Solutions Inc. (formerly Platform Specialty Products Corporation). He received a Bachelor of Science from Kettering University (formerly General Motors Institute) and Master of Business Administration with distinction in Finance from Harvard Business School.

**Defendant Rickertsen**

46.     Defendant Rickertsen has served as a Company director since November 2023. He also serves as a member of the Compensation and Talent Development Committee. Previously, he served as a director of Pre-Merger Hut 8 from December 2021 until November 2023.

47.     The 2025 Proxy Statement stated the following about Defendant Rickertsen:

Mr. Rickertsen is currently managing partner of Pine Creek Partners LLC, a private equity investment firm, a position he has held since January 2004. From September 1994 to January 2004, Mr. Rickertsen was a managing partner at Thayer Capital Partners where he founded three private equity funds totaling over $1.4 billion. Mr. Rickertsen has also served as a director of MicroStrategy Incorporated, a Bitcoin treasury and business intelligence company, since October 2002, where he is currently the chair of the compensation committee and a member of the audit committee, and Magnera Corporation, a non-woven materials company, since October 2024, where he is currently the chair of the audit committee and a member of the compensation committee. Mr. Rickertsen has also served as a member of the board of directors and audit and compensation committees of Berry Global Inc., a global manufacturer and marketer of value-added plastic consumer packaging and engineered materials, from January 2013 to November 2024. He served as a member of the boards of directors and audit committees of Apollo Senior Floating Rate Fund Inc. and Apollo Tactical Income Fund Inc., each of which is a closed-end management investment company, from 2011 and 2013, respectively, to January 2024. Mr. Rickertsen received a Bachelor of Science from Stanford University and a Master of Business Administration from Harvard Business School. He is also a published author.

**Defendant Shattuck**

48.     Defendant Shattuck has served as a Company director since November 2023. He also serves as the Chair of the Compensation and Talent Development Committee and as a member of the Audit Committee. Previously, he served as a director of USBTC from December 2021 until November 2023.

49.     The 2025 Proxy Statement stated the following about Defendant Shattuck:

Mr. Shattuck previously served as the Chairman of Exelon from February 2012 to April 2022, and previously served as the Executive Chairman of the Board of Exelon from March 2012 through February 2013. Prior to its merger with Exelon, Mr. Shattuck was the Chairman, President, and Chief Executive Officer of Constellation Energy from October 2001 to February 2012. Constellation Energy owned energy-related businesses, including a wholesale and retail power marketing

14

and merchant generation business. Mr. Shattuck was previously at Deutsche Bank, where he served as Chairman of the Board and CEO of Deutsche Banc Alex. Brown and as Global Head of Investment Banking and Global Head of Private Banking. While Chairman and CEO of Constellation Energy and Executive Chairman of Exelon, Mr. Shattuck served as Chairman of the Board of the Institute of Nuclear Power Operations and was a member of the Executive Committee of the Board of Edison Electric Institute and the Nuclear Energy Institute. He was also Co-Chairman of the Center for Strategic & International Studies Commission on Nuclear Policy in the United States and Executive Committee member of the Council on Competitiveness. Mr. Shattuck also currently serves on the board of directors of Gap Inc. since 2002, as Board Chair, and Capital One Financial Corporation since 2003. Mr. Shattuck has a Bachelor of Arts from Williams College and a Master of Business Administration from the Stanford Graduate School of Business.

**Defendant Tai**

50.     Defendant Tai has served as the Chair of the Board since November 2023. He also serves as a member of the Nominating and Governance Committee. Previously, he served as a director of Pre-Merger Hut 8 from March 2018 until November 2023.

51.     The 2025 Proxy Statement stated the following about Defendant Tai:

Mr. Tai is a venture capitalist and was an early investor in high profile start-ups including Canva, Color Genomics, Dapper Labs, Safety Culture, Tweetdeck, and Zoom Video. Previously, Mr. Tai co-founded several successful technology companies including IPInfusion and Treasure Data Inc., where he served as Chairman, and has served as a director of seven publicly listed companies. Mr. Tai holds a Bachelor of Science in Electrical Engineering with Honors from the University of Illinois and a Master of Business Administration from Harvard University.

**Defendant Wilkinson**

52.     Defendant Wilkinson has served as a Company director since November 2023. She also serves as the Chair of the Nominating and Governance Committee and as a member of the Compensation and Talent Development Committee. Previously, she served as a director of USBTC from August 2022 until November 2023.

53.     The 2025 Proxy Statement stated the following about Defendant Wilkinson:

Ms. Wilkinson is the Chief Executive Officer of Ingenuity Corporation, an innovation consulting firm, a role she has held since founding the firm in January 2017. She has also served as a director of INNOVATE Corp. since August 2022, where she is currently a member of the audit committee and compensation committee. Ms. Wilkinson also serves as a Lecturer in Management at the Stanford Graduate School of Business, a role she has held since May 2015. Before joining the Stanford Graduate School of Business, Ms. Wilkinson was a Kauffman Foundation Grantee for Research on High Growth Entrepreneurs from 2013 to 2015 and a Senior Fellow at the Harvard Kennedy School of Government from 2009 to 2015. Ms. Wilkinson served in The White House as a White House Fellow and Special Assistant to the United States Trade Representative from 2004 to 2007. She also has experience as a strategy consultant at McKinsey & Company and as a mergers and acquisitions banker at J.P. Morgan. Ms. Wilkinson holds a Bachelor of Arts and a Master of Arts from Stanford University and a Master of Business Administration from the Stanford Graduate School of Business.

**Relevant Non-Parties**

54.     The Securities Class Action captioned *In re Hut 8 Securities Litigation*, Case No. 1:24-cv-00904-VM, in the United States District Court for the Southern District of New York, incorporates statements from a former employee of Hut 8 who offered their experience as a confidential witness.[2]

*CW 1*

55.     CW 1 worked for the Company as a data analyst in the months leading up to the merger and thereafter. CW 1's responsibilities included tracking daily miner outages and managing miner counts and operations in order to maximize operational capacity of Hut 8's Bitcoin miners.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as officers and/or directors of Hut 8 and because of their ability to control the business and corporate affairs of Hut 8, the Individual Defendants owed Hut 8 and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were

---

[2] As was done in the Securities Class Action, all confidential witnesses are referred to in the masculine to preserve their anonymity.

and are required to use their utmost ability to control and manage Hut 8 in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hut 8 and its shareholders so as to benefit all shareholders equally.

57.     Each director, and officer of the Company owes to Hut 8 and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors, and/or officers of Hut 8, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of Hut 8 were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Individual Defendant, by virtue of his or her position as a director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Hut 8, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Hut 8's Board at all relevant times.

61.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

62.     To discharge their duties, the officers and directors of Hut 8 were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Hut 8 were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to Hut 8's own Code of Business Conduct and Ethics ("Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Hut 8 conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)　　establish and maintain systematic and accurate records and reports of the business and internal affairs of Hut 8 and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)　　maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Hut 8's operations would comply with all applicable laws and Hut 8's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)　　exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)　　refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)　　examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.　　Each of the Individual Defendants further owed to Hut 8 and the shareholders the duty of loyalty requiring that each favor Hut 8's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.　　At all times relevant hereto, the Individual Defendants were the agents of each other and of Hut 8 and were at all times acting within the course and scope of such agency.

65.     Because of their advisory, executive, managerial, directorial, and controlling positions with Hut 8, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hut 8.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority

of the Board, each of the Individual Defendants who is a director of Hut 8 was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

70. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hut 8 and was at all times acting within the course and scope of such agency.

## HUT 8'S CODE OF ETHICS

72. The Company's Code of Ethics "sets basic requirements for business conduct and serves as a foundation for Company policies, procedures and guidelines, all of which provide additional guidance on expected behaviors."

73. The Company's Code of Ethics states it applies to "Every Company director, officer, employee and other personnel that the Company may determine should be subject to this Code of Business Conduct and Ethics, such as contractors or consultants (each a "**Covered Person**")" (emphasis in original).

74. Under the heading "Standards of Good Professional Ethics," the Code of Ethics states:

> All business dealings undertaken on behalf of the Company, including with its security holders, customers, suppliers, competitors and employees, must be

conducted in a manner that preserves the Company's integrity and reputation. The Company seeks to avoid misrepresentations of material facts, manipulation, concealment, abuse of confidential information, or any other illegal or unfair practices in all activities undertaken by or on behalf of the Company.

75.     Under the heading "Conflicts of Interest," the Code of Ethics states, in relevant part:

Avoid all conflicts of interest by always putting the Company's interests first. Each Covered Person shall ensure that their judgment and ability to make decisions is not compromised and shall never use their position at the Company to serve personal interests or relationships.

Conflicts of interest arise whenever actions are based on interests other than those of the Company. All Covered Persons are required to avoid any personal activity, investment or association that may interfere with the Company's best interests.

***

*Financial Conflicts of Interest*

A financial conflict of interest is one where there is or appears to be opportunity for personal financial gain, financial gain to close relatives or close friends, or where it might be reasonable for another party to take the view that financial benefits might affect that person's actions.

***

The level of financial interest is not the determining factor as to whether a conflict should be disclosed. What might be 'not material' or 'not significant' for one person might be very significant for another. Good practice in many situations will mean the disclosure of any financial interest, however small.

*Non-financial Conflicts of Interest*

Non-financial interests can also come into conflict, or be perceived to come into conflict, with a person's obligations or commitments to the Company. Such non-financial interests may include any benefit or advantage, including, but not limited to, direct or indirect career advancement, education or gain to immediate family.

76.     Under the heading "Use Resources Responsibly," the Code of Ethics states, in relevant part:

22

The Company expects everyone to act like an owner and act in the best interest of the Company. Covered Persons are provided with a range of resources, including, an email account, computer equipment and software, communications platforms, office equipment and supplies and corporate financial resources. Covered Persons must treat these resources with respect and use them responsibly. All Covered Persons are prohibited from using Company resources for anything illegal, unethical or that would harm the Company if exposed publicly. Company property should only be used for legitimate business purposes.

These resources are the Company's property and the Company may access these resources at any time. Any information sent, received or stored on any Company resources are not considered private. The Company may access any of this information at any time, with or without the knowledge, consent or approval of a Covered Person. When a Covered Person leaves the Company, they must return all Company resources.

77. Under the same heading, in a subsection titled "Ensure Financial Integrity," the Code of Ethics states:

The Company is committed to the transparency and integrity of publicly filed financial reports and other communications. Covered Persons must do their part to ensure that the Company's public disclosure is full, fair, accurate, timely and understandable.

Always act responsibly and exercise sound judgment regarding matters involving the Company's finances. Keep accurate, complete and timely records, and submit accurate and complete reports. Do not mislead, manipulate or improperly influence the Company's finance team or external auditors or make any false or misleading statements or omissions in the Company's public disclosure. Covered Persons should not personally enter into any side agreements or other informal arrangements, written or oral, related to the Company.

78. Under the heading "Comply with Laws," the Code of Ethics state, in relevant part:

Always follow applicable laws, rules and regulations and do not engage in any type of illegal, unethical, fraudulent or corrupt business practices for any reason. The Company expects each Covered Person to understand the legal and regulatory requirements applicable to his or her business unit and areas of responsibility.

### *Insider Trading*

Covered Persons must comply with applicable insider trading laws, which generally prohibit buying or selling securities of the Company while in possession of material non-public information about the Company. See the Insider Trading Policy for more detail.

79.     Under the heading "Report Violations," the Code of Ethics states, in relevant part:

Upon knowledge or suspicion of a violation of the law, the Code of Business Conduct and Ethics, any Company policy or any unethical or questionable act or behavior, immediately report the violation or suspected violation to the Chair of the Audit Committee and the Chief Legal Officer (or, if the Company does not have a Chief Legal Officer, its Chief Financial Officer). Covered Persons should not investigate on their own as they may risk compromising the integrity of a formal investigation.

In cases where an individual reports a suspected violation of policy or law with reasonable belief, the Company will keep its discussions and actions confidential in compliance with applicable law and regulation. Each Covered Person is required to cooperate fully with any investigation. See the Whistleblower Policy for more detail.

Nothing in this Policy shall be construed so as to  restrict or interfere with one's rights or ability to:  communicate, without notice to or approval by the Company, with any government agencies as provided for, protected under or warranted by applicable law; participate in any investigation or proceeding that may be conducted by any government agency, including providing documents or other information without notice to the Company; or receive an award from any government agency for information provided to any such government agency.

80.     Under the heading "Consequences for Violations," the Code of Ethics states:

Any violation of the Code of Business Conduct and Ethics, including fraudulent reports, may result in disciplinary action including termination of employment for cause or termination of service and, if warranted, legal proceedings. Violations include violation of the Code of Business Conduct and Ethics or another Company policy or procedure, violation of applicable laws, rules or regulations, deliberate failure to promptly report a violation or withhold relevant information concerning a violation, refusal to cooperate in the investigation of a known or suspected violation without valid legal reason or taking action against anyone who reports a violation or breach of any of the above.

The Board may, from time to time, permit departures from the terms hereof, only in advance and under exceptional circumstances. No provision contained herein is intended to give rise to civil liability to shareholders, competitors, employees or other persons, or to any other liability whatsoever. For the avoidance of doubt, any waiver of this Code of Business Conduct and Ethics for directors and executive officers of the Company may be made only by the Board and must be publicly disclosed, along with the reasons for the waiver, in accordance with applicable U.S. stock exchange rules.

Under applicable Canadian securities laws, conduct by a director or officer that constitutes a material departure from the Code of Business Conduct and Ethics may constitute a material change that requires the filing of a material change report, which includes the date of the departure from the Code of Business Conduct and Ethics, the parties involved in the departure, the reason why the Board has not sanctioned the departure and any measures the Board has taken to remedy the departure.

81. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and law.

## HUT 8'S AUDIT COMMITTEE CHARTER

82. The Company's Audit Committee Charter (the "Audit Committee Charter") states that the purpose of the Audit Committee is as follows:

The Committee's purpose is to assist the Board in its oversight of:

• the quality and integrity of the Company's financial statements and related information, including the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

• the independence, qualifications, appointment and performance of the Company's external auditor (the "**external auditor**");

• the Company's disclosure controls and procedures, internal control over financial reporting, and management's responsibility for assessing and reporting on the effectiveness of such controls;

• the organization and performance of the Company's internal audit function;

• the Company's compliance with applicable legal and regulatory requirements; and

• the Company's enterprise risk management processes.

(emphasis in original).

83.    Under the heading "Responsibilities and Duties of the Committee," in a subsection titled "Financial Reporting," the Code of Ethics states the responsibilities of the Audit Committee as:

• Prepare an audit committee report to be included in the Company's annual proxy circular.

• Prior to their public disclosure, review and discuss with management and, if applicable, the external auditor or the internal auditor:

i.      the Company's annual financial statements and the related MD&A, including the discussion of critical accounting estimates under the Generally Accepted Accounting Principles ("GAAP") included therein and, if appropriate, recommend to the Board the approval, filing and disclosure of such information;

ii.     the Company's annual earnings press releases, including any pro forma or non-GAAP information included therein;

iii.    the Company's quarterly unaudited financial statements and associated MD&A, including the discussion of critical accounting estimates included therein;

iv.     the Company's quarterly earnings press releases, including any pro forma or non-GAAP information included therein;

v.      the type and presentation of financial information and earnings guidance provided to analysts, ratings agencies and others;

vi.     to the extent they include financial information extracted or derived from the Company's financial statements, other public reports or filings by the Company, including the Company's annual report on Form 10-K and proxy circular;

vii.    internal controls (or summaries thereof) and the integrity of the financial reporting and related attestations by the external auditor of the Company's internal control over financial reporting;

26

viii.   any significant difficulties encountered during the course of the audit, including, but not limited to, any restrictions on the scope of work or access to required information;

ix.   and the Company's guidelines and policies governing the process of risk assessment and risk management.

84.   Under the same heading, in a subsection titled "Financial Reporting Processes, Accounting Policies and Internal Controls," the Audit Committee Charter states the responsibilities of the Audit Committee as:

• Review and discuss with management and the external auditor and internal auditor, and monitor, report and where appropriate, provide recommendations to the Board on:

i.   the adequacy and effectiveness of the Company's system of internal control over financial reporting, including any significant deficiencies and significant changes in internal controls;

ii.   the integrity of the Company's external financial reporting processes;

iii.   the Company's disclosure controls and procedures, including any significant deficiencies in or material non-compliance with, such controls and procedures;

iv.   and the relationship of the Committee with other committees of the Board and management.

• Understand the scope of the external auditors' review of internal control over financial reporting and obtain reports on significant findings and recommendations, together with management responses.

• Review and discuss with the Company's Chief Executive Officer (the "CEO") and CFO the process for the certifications to be provided and receive and review any disclosure from the CEO and CFO made in connection with the required certifications of the Company's quarterly and annual reports filed, including: (i) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

27

• Review major issues and analyses prepared by management or the external auditor or internal auditor regarding accounting principles and financial reporting issues and judgments made in connection with the preparation of financial statements, including any significant changes in the Company's selection or application of accounting principles, the effect of non-GAAP methods on the financial statements, complex or unusual transactions and highly judgmental areas, such as the presentation and impact of significant risks and uncertainties and key estimates and judgments of management that may be material to financial reporting, the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

• Review and discuss with the independent auditors (outside of the presence of management) how the independent auditors plan to handle their responsibilities under the Private Securities Litigation Reform Act of 1995, and request assurance from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

• Discuss with the independent auditors those matters brought to the attention of the Committee by the independent auditors pursuant to Auditing Standard No. 1301, Communications with Audit Committees, as amended ("AS 1301").

• Based on the Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditors of the matters required to be discussed by AS 1301, and (3) with the independent auditors concerning the independent auditor's independence, the Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

• Review and discuss with the independent auditors the report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act.

• Approve transactions between the Company and its officers, directors, principal shareholders and affiliates, in accordance with the terms of the Company's Code of Business Conduct and Ethics and Related Person Transactions Policy.

• Review the Company's policies and procedures for reviewing and approving or ratifying related-party transactions as set forth in the Related Person Transactions Policy.

• Review the Company's policies and procedures for monitoring compliance with the Code of Business Conduct and Ethics.

• Review the Company's procedures for reviewing reports of whistleblowing as set forth in the Whistleblower Policy.

• Review any reports of whistleblowing, including all reports made to the Company's anonymous and confidential helpline, with the Company's counsel in accordance with the Whistleblower Policy.

• Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, including procedures for confidential, anonymous submissions by employees regarding questionable accounting or auditing matters.

• Meet periodically with management in the absence of the external auditor.

• Consider the risk of management's ability to override the Company's internal controls.

• At least annually, review, with the Company's legal counsel and accountants, all legal, tax, or regulatory matters that could have a significant impact on the Company's financial statements. Review the effectiveness of the system for monitoring compliance with laws and regulations and the results of management's investigation and follow-up of any instances of non-compliance. Receive and review periodic reports from the Company with respect to the Company's pending or threatened material litigation. Review the appropriateness of the disclosure thereof in the documents reviewed by the Committee.

• Discuss the Company's policies with respect to risk assessment and risk management, including cybersecurity, the Company's insurance and fidelity bond coverage, as well as the Company's major financial risk exposures, the steps management has undertaken to control them, and any reports of the internal auditor concerning such matters.

• Review the Company's compliance with internal policies and the Company's progress in remedying any material deficiencies that could have a significant impact on the Company.

• Review the findings of any examinations by regulatory agencies, and any external auditors observations made regarding those findings.

• Review the internal accounting department's budget and staffing.

• Establish systems for the regular reporting to the Committee by each of the Company's management, external auditors and internal accounting department of any significant judgments made by management in the preparation of the financial statements and the opinions of each as to appropriateness of such judgments.

85.     The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Securities Act and the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

86.     Bitcoin is a virtual currency which exists on a digital ledger called the blockchain. The Bitcoin blockchain is a peer-to-peer network of "blocks" which identify every Bitcoin transaction. In order to add a block onto the Bitcoin blockchain, the transaction must be verified through a process called Bitcoin mining.

87.     Bitcoin mining is the process in which one uses specialized computer equipment to solve complex math problems to create new bitcoin. Bitcoin mining is measured in "hashrate" which is the speed in which a computer can solve the complex math problems. The higher the hashrate, the greater probability of the miner to create a new block on the Bitcoin blockchain. Bitcoin mining can be costly, as it requires large amounts of electricity and computing power to successfully mine one bitcoin.

88.     Pre-Merger Hut 8 was a Canadian Bitcoin mining company founded in 2017 and had various mining sites throughout Canada, including two digital asset mining sites in Alberta, Canada, five high performance computing data centers in British Columbia and Ontario, Canada, and one authorized repair center in Alberta, Canada.

89.



90.

91.     Prior to the Merger, USBTC was a privately held industrial-scale operator of Bitcoin mining sites. USBTC had several revenue streams, including self-mining, hosting, managed infrastructure operations, and equipment sales. USBTC's self-mining segment consisted of various Bitcoin mining facilities across the United States. Leading up to the Merger, USBTC had a total of approximately 182,000 miners across four digital mining sites.

92.     One of USBTC's mining sites was a 50% interest in the King Mountain JV which had access to approximately 280 MW of electricity. USBTC acquired their interest in the King

Mountain JV from TZRC through an auction as a result of a Chapter 11 bankruptcy filing by Compute North. NextEra held the other 50% interest in TZRC. Leading up to the Merger, Marathon was the biggest customer of the King Mountain JV.

**The Merger**

93. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

94. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

95. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



98.     On February 7, 2023, Pre-Merger Hut 8 and USBTC issued the Merger Announcement Press Release announcing a "merger of equals" between Pre-Merger Hut 8 and USBTC pursuant to a business combination agreement which was unanimously approved by both board of directors.  The Merger Announcement Press Release detailed that Pre-Merger Hut 8 and USBTC stockholders would each own approximately fifty percent of Hut 8 stock as Pre-Merger Hut 8 stockholders would receive .2 shares of Hut 8 stock for each share of Pre-Merger Hut 8 stock, and USBTC stockholders would receive .6717 shares of Hut 8 stock for each share of USBTC capital stock.

99.     The Merger Announcement Press Release also stated that the Hut 8 Board would consist of five directors from Pre-Merger Hut 8 and five directors from USBTC. The Merger Announcement Press Release also announced that Defendant Leverton would be appointed as Hut 8's CEO, Defendant Visram would be appointed as Hut 8's CFO, Defendant Genoot would be

33

appointed as the Company's President, and Defendant Ho would be appointed as the Company's CSO.

100.    On February 13, 2023, the Company filed the Initial Registration Statement which was signed by Defendants Genoot and Ho.

101.    Throughout the Relevant Period, Hut 8 filed several amendments to the initial registration statement on Forms S-4/A on April 18, 2023, June 13, 2023, July 17, 2023, August 24, 2023, September 18, 2023, November 6, 2023, and November 8, 2023 which were all signed by Defendants Genoot and Ho.

102.    On November 9, 2023, the SEC declared the amended registration statement effective. The same day, Hut 8 filed a prospectus on Form 424(b)(3) with the SEC (collectively with the registration statement, the "Registration Statement").

103.    The Merger closed on November 30, 2023.

### False and Misleading Statements

104.    The Relevant Period began on February 13, 2023, when the Company filed the Initial Registration Statement.[3]

105.    The Initial Registration Statement provided investors with boilerplate risk disclosures regarding energy issues at the Company's facilities, stating:

> ***The operation of the grids USBTC relies on, including the NYISO and ERCOT grids, as well as USBTC's information technology systems and other assets and conduct of other activities subjects USBTC to a variety of risks, including the breakdown or failure of equipment***, accidents, security breaches, viruses [and] ***outages affecting information technology systems***[.]

(Emphasis added).

---

[3] Every statement attributed to the Initial Registration Statement also appears in all amendments and the Registration Statement.

106. The Initial Registration Statement also provided investors with boilerplate risks about internet disruptions at Hut 8's facilities, stating:

> **_USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin._**
>
> A disruption of the Internet may affect the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

107. The above statements in ¶¶ 104-106 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the King Mountain JV facility was already experiencing internet and energy issues; and (2) as a result, the King Mountain JV was not operating efficiently. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

#### *January 18, 2024 J Capital Research Report*

108. The truth emerged on January 18, 2024, when J Capital Research published the J Capital Report, titled "The Coming HUT Pump and Dump: Management hiding stock ownership through undisclosed related party, a stock-promoter cabal, and a host of left-for-dead assets."

109. The J Capital Report revealed that the King Mountain JV "has historically failed to provide energy and high-speed internet" and that the Merger "lacked both reliable power and internet." The J Capital Report quoted a proof of claim filed on November 23, 2022, by Marathon against Compute North alleging that Computer North "fail[ed] to energize thousands of miners" and "also repeatedly failed to provide an adequate high-speed network to allow Marathon's miners to mine Bitcoin at full capacity."

35

110.    The J Capital Report also quoted Marathon's 2023 Form 10-K which stated that Marathon "experienced significant downtime in the second and third quarters as a result of… and delays in energization at King Mountain."

111.    The J Capital Report further revealed that the King Mountain JV facility "uses a Starlink satellite network instead of a broadband connection to access the Internet," which is "unheard of in the Bitcoin mining industry" because Starlink "is an expensive and unreliable choice for mining at scale."

112.    On this news, the price of the Company's stock fell $2.16 per share, or 23.3%, from a closing price of $9.28 per share on January 17, 2024 to close at $7.12 per share on January 18, 2024.

## SUBSEQUENT DEVELOPMENTS

113.    After the Relevant Period, on February 12, 2024, the Company filed a Form 8-K with the SEC announcing that on February 6, 2024, the Board notified Defendant Leverton of her termination as Hut 8's CEO, effective immediately. The 8-K also stated that Defendant Genoot was appointed as the Company's CEO effective immediately.

114.    On August 6, 2024, the Company issued a press release announcing that Defendant Visram had resigned as the Company's CEO effective August 20, 2024.

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE

115.    Throughout the Relevant Period, the Individual Defendants were aware of the issues at the King Mountain JV facility, such that they knew or recklessly disregarded the true extent of the materially false and/or misleading statements regarding USBTC and the King Mountain JV facility.

36

116. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

117. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

118. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

119.

120.

121.

122. The Company's employees also expressed concerns about the King Mountain JV facility. For example, as reported by the amended complaint in the Securities Class Action, CW 1 stated that he received energy usage reports indicating energy issues in the hashrate failure. Additionally, CW 1 stated that the Bitcoin miners at the King Mountain JV facility were impeding the Company's ability to mine because they were inefficient. CW 1 also stated that there were often network service dips and failures which were reported in daily outage reports and that these outages were often significant and were caused by broken or offline miners.

123. According to CW 1, Defendant Genoot complained about the efficiency of the King Mountain JV facility during meetings. Also, CW 1 states that higher ups directed data analysts to classify offline miners as overheated in order to mask the true nature of the issues at the King Mountain JV facility. Indeed, CW 1 revealed that over half of the outages were falsely labeled as miners being overheated rather than offline. CW 1 also had daily discussions with the Director of Infrastructure before the merger about the energy issues at the King Mountain JV facility.

**DAMAGES TO HUT 8**

124. As a direct and proximate result of the Individual Defendants' conduct, Hut 8 has lost and expended, and will continue to lose and expend, many millions of dollars.

125. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

126. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

128. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

129. As a direct and proximate result of the Individual Defendants' conduct, Hut 8 has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

130. Plaintiff brings this action derivatively and for the benefit of Hut 8 to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, and/or officers of Hut 8, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act.

131. Hut 8 is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

132. Plaintiff is, and has continuously been at all relevant times, a shareholder of Hut 8. Plaintiff will adequately and fairly represent the interests of Hut 8 in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

133.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

134.     A pre-suit demand on the Board of Hut 8 is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Genoot, Ho, Flinn, O'Neal, Rickertsen, Shattuck, Tai, and Wilkinson (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants who are on the Board at the time this action is commenced.

135.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

136.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Hut 8 to issue materially false and misleading statements. Specifically, the Director-Defendants caused Hut 8 to issue false and misleading statements which were intended to make Hut 8 appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

137.     Additional reasons that demand on Defendant Genoot is futile follow. Defendant Genoot has served as the Company's CEO since February 2024. Prior to the Merger, he served as

the COO, President, and director of USBTC from December 2020 until November 2023. The Company provides Defendant Genoot with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Genoot also signed the false and misleading Registration Statement. Moreover, Defendant Genoot is a defendant in the Securities Class Action. Additionally, the Merger Announcement Press Release stated that the USBTC Board unanimously approved of the business combination agreement. Also, the Merger Announcement Press Release stated that the directors and officers of USBTC entered into a stockholder support agreement with Pre-Merger Hut 8, agreeing to vote their USBTC shares in favor of the Merger. For these reasons, too, Defendant Genoot breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Ho is futile follow. Defendant Ho has served as the Company's CSO since November 2023. He previously served as the CEO and Chairman of USBTC from December 2020 until November 2023. The Company provides Defendant Ho with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As a trusted, long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Ho also signed the false and misleading Registration Statement.

Moreover, Defendant Ho is a defendant in the Securities Class Action. Additionally, the Merger Announcement Press Release stated that the USBTC Board unanimously approved of the business combination agreement. Also, the Merger Announcement Press Release stated that the directors and officers of USBTC entered into a stockholder support agreement with Pre-Merger Hut 8, agreeing to vote their USBTC shares in favor of the Merger. For these reasons, too, Defendant Ho breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139. Additional reasons that demand on Defendant Flinn is futile follow. Defendant Flinn has served as a Company director since November 2023. He also serves as the Chair of the Audit Committee. He previously served as a director of Pre-Merger Hut 8 from August 2018 until November 2023. As a trusted, long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, the Merger Announcement Press Release stated that the Pre-Merger Hut 8 Board unanimously approved of the business combination agreement. Also, the Merger Announcement Press Release stated that the directors of Pre-Merger Hut 8 entered into a support and voting agreement with USBTC, agreeing to vote their Pre-Merger Hut 8 shares in favor of the Merger. For these reasons, too, Defendant Flinn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140. Additional reasons that demand on Defendant O'Neal is futile follow. He also serves as a member of the Audit Committee and Nominating and Governance Committee. He previously served as a director of USBTC from March 2021 until November 2023. As a trusted,

long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, the Merger Announcement Press Release stated that the USBTC Board unanimously approved of the business combination agreement. Also, the Merger Announcement Press Release stated that the directors and officers of USBTC entered into a stockholder support agreement with Pre-Merger Hut 8, agreeing to vote their USBTC shares in favor of the Merger. For these reasons, too, Defendant O'Neal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Rickertsen is futile follow. He also serves as a member of the Compensation and Talent Development Committee. Previously, he served as a director of Pre-Merger Hut 8 from December 2021 until November 2023. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, the Merger Announcement Press Release stated that the Pre-Merger Hut 8 Board unanimously approved of the business combination agreement. Also, the Merger Announcement Press Release stated that the directors of Pre-Merger Hut 8 entered into a support and voting agreement with USBTC, agreeing to vote their Pre-Merger Hut 8 shares in favor of the Merger. For these reasons, too, Defendant Rickertsen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.     Additional reasons that demand on Defendant Shattuck is futile follow. Defendant Shattuck has served as a Company director since November 2023. He also served as the Chair of the Compensation and Talent Development Committee and as a member of the Audit Committee. Previously, he served as a director of USBTC from December 2021 until November 2023. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, the Merger Announcement Press Release stated that the USBTC Board unanimously approved of the business combination agreement. Also, the Merger Announcement Press Release stated that the directors and officers of USBTC entered into a stockholder support agreement with Pre-Merger Hut 8, agreeing to vote their USBTC shares in favor of the Merger. For these reasons, too, Defendant Shattuck breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.     Additional reasons that demand on Defendant Tai is futile follow. Defendant Tai has served as the Chair of the Board since November 2023. He also serves as a member of the Nominating and Governance Committee. Previously, he served as a director of Pre-Merger Hut 8 from March 2018 until November 2023. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, the Merger Announcement Press Release stated that the Pre-Merger Hut 8 Board unanimously approved of the business combination agreement. Also, the Merger Announcement Press Release

stated that the directors of Pre-Merger Hut 8 entered into a support and voting agreement with USBTC, agreeing to vote their Pre-Merger Hut 8 shares in favor of the Merger. For these reasons, too, Defendant Tai breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144. Additional reasons that demand on Defendant Wilkinson is futile follow. Defendant Wilkinson has served as a Company director since November 2023. She also serves as the Chair of the Nominating and Governance Committee and as a member of the Compensation and Talent Development Committee. Previously, she served as a director of USBTC from August 2022 until November 2023. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, the Merger Announcement Press Release stated that the USBTC Board unanimously approved of the business combination agreement. Also, the Merger Announcement Press Release stated that the directors and officers of USBTC entered into a stockholder support agreement with Pre-Merger Hut 8, agreeing to vote their USBTC shares in favor of the Merger. For these reasons, too, Defendant Wilkinson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

145. Additional reasons that demand on the Board is futile follow.

146. Defendants Flinn (as Chair), O'Neal, and Shattuck (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and

46

regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Securities Act and the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

147.



148.     In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

149.     Hut 8 has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Hut 8 any part of the damages Hut 8 suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

150.     The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151.    The acts complained of herein constitute violations of fiduciary duties owed by Hut 8's officers and directors, and these acts are incapable of ratification.

152.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Hut 8. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Hut 8, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

153.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Hut 8 to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

155.   Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred fifty-four (154), as though fully set forth herein.

156.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hut 8's business and affairs.

157.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

158.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Hut 8.

159.   In breach of their fiduciary duties owed to Hut 8, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the King Mountain JV facility was already experiencing internet and energy issues; and (2) as a result, the King Mountain JV was not operating efficiently. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

160.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

161. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls while two of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $2 million.

162. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Hut 8's securities.

163. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Hut 8's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

164. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

165.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hut 8 has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

166.     Plaintiff, on behalf of Hut 8, has no adequate remedy at law.

### SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

167.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth in the foregoing paragraphs one (1) through one hundred fifty-four (154) as though fully set forth herein.

168.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Hut 8.

169.     The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Hut 8 that was tied to the performance or artificially inflated valuation of Hut 8 or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

170.     Plaintiff, as a shareholder and a representative of Hut 8, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

171.     Plaintiff, on behalf of Hut 8, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

172.   Plaintiff incorporates by reference and re-alleges each and every allegation contained in the foregoing paragraphs one (1) through one hundred fifty-four (154) as though fully set forth herein.

173.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

174.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Hut 8 to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

175.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

176.   Plaintiff, on behalf of Hut 8, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

177.   Plaintiff incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs one (1) through one hundred fifty-four (154), as though fully set forth herein.

178.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of Hut 8 in a manner consistent with the operations of a publicly held corporation.

179.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hut 8 has sustained and will continue to sustain significant damages.

180.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

181.    Plaintiff, on behalf of Hut 8, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

182.    Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred fifty-four (154), as though fully set forth herein.

183.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Hut 8, for which they are legally responsible.

184.    As a direct and proximate result of the Individual Defendants' abuse of control, Hut 8 has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.    Plaintiff, on behalf of Hut 8, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Defendants Genoot, Ho, Leverton, and Visram for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

186.    Plaintiff incorporates by reference and realleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred fifty-four (154), as though fully set forth herein.

54

187.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Hut 8 shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

188.    Federal law provides Hut 8 with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

189.    The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Merger contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

190.    Hut 8 is the registrant for the Offering. Defendants Genoot, Ho, Leverton, and Visram were responsible for the contents and dissemination of the Registration Statement.

191.    As issuer of the shares, Hut 8 is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

192.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

193.    Defendants Genoot, Ho, Leverton, and Visram, because of their positions of control and authority as officers and/or directors of Hut 8, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Hut 8, including the wrongful acts complained of herein and in the Securities Class Action.

194.    Accordingly, Defendants Genoot, Ho, Leverton, and Visram are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action

for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

195.    As such, Hut 8 is entitled to receive all appropriate contribution or indemnification from Defendants Genoot, Ho, Leverton, and Visram.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Hut 8, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Hut 8;

(c)    Determining and awarding to Hut 8 the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Hut 8 and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hut 8 and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

56

2.  a provision to permit the shareholders of Hut 8 to nominate at least four candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Hut 8 restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 9, 2026

LAW OFFICE OF JOSE D. SOSA, P.C.

_____/s/  Jose D. Sosa_____
Jose D. Sosa
Florida Bar No. 150878
1141 Via Jardin
Palm Beach Gardens, FL 33418
Telephone: (561) 670-8237
Email: pepe@pepesosalaw.com
Email: sosalaw@yahoo.com

**THE BROWN LAW FIRM, P.C.**
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

*Attorneys for Plaintiff*
*Pro Hac Vice Admission to be requested after*
*filing of Complaint and commencement of case*